S. M. MOORE, Administrator, Appellee, v. KEOKUK & WESTERN RAILWAY COMPANY, Appellant.

| 89 | 223 |
| 96 | 705 |
| 89 | 223 |
| 109 | 435 |
| 89 | 223 |
| 117 | 674 |
| 89 | 223 |
| 122 | 221 |
| 89 | 223 |
| 124 | 51 |

1. **Negligence**: DAMAGES: VERDICT.  A verdict of six hundred dollars for the negligent killing of a man seventy-one years of age, whom the evidence shows to have been of such industrious and economical habits that he might have earned more than a living in the management of his eighty acre farm, is not excessive.

2. **Railroads**: PERSONAL INJURY: CONTRIBUTORY NEGLIGENCE: EVIDENCE.  In an action to recover damages for the negligent killing of a man at a highway crossing, it appeared that the highway approached the crossing by a gradual descent until within thirty or forty feet of the railroad, from which point the road was level; that when the deceased was within thirty or forty feet of the crossing he could have seen the approaching train if he had looked, and that the train must then have been more than two hundred feet distant; that the dangerous character of the crossing was known to the deceased, but it did not appear that he stopped to look if any train was approaching, and according to the undisputed evidence of two witnesses he approached the crossing with his horse on a trot.  *Held*, that the evidence of contributory negligence was such that a verdict for the plaintiff must be set aside.

*Appeal from Appanoose District Court.*—HON. W. I. BABB, Judge.

WEDNESDAY, OCTOBER 11, 1893.

THE plaintiff states as his cause of action that on October 20, 1890, while deceased was using due care, the defendant negligently ran a train of cars and engine against the deceased, whereby he was killed; that the defendant was not only negligent in operating said train, but did, at the time, maintain a defectively con-

structed highway crossing. The plaintiff asks judgment for ten thousand dollars. The defendant answered, denying generally, and upon these issues the case was tried to a jury, resulting in a verdict and judgment for the plaintiff for six hundred dollars. The defendant appeals.—*Reversed.*

*F. T. Hughes* and *Tannehill, Vermillion & Vermillion,* for appellant.

*Gray D. Porter,* for appellee.

GIVEN, J.—I. At the close of the evidence on behalf of the plaintiff the defendant moved to take the

1. NEGLIGENCE: damages: verdict.

case from the jury upon two grounds, namely, because no damage to the estate of deceased had been shown, and because the evidence showed that the deceased was guilty of negligence directly contributing to the cause of his death. The motion was overruled, to which the defendant excepted. These questions were preserved in the further progress of the case, and are the only ones urged in argument by the appellant.

The appellant's claim as to the measure of damages is stated thus: "It is such damages as the estate of the deceased suffered pecuniarily by his death. Nothing can be allowed on account of pain and suffering and distress of his family on account thereof, or for loss of his society. His occupation, annual earnings, age, health, habits, and estate may be shown as affecting the question of damages. His probable earnings, less his expenses, constitute the measure of his damages." The instructions given are in accord with this statement of the rule and the authorities cited. No complaint is made against the instructions, but the contention is that the evidence showed that because of his advanced age, seventy-one years, and consequent infirmities, the deceased was incapable of earning more

than a living, and in a few years would have become incapable of earning anything. It is unnecessary that we here discuss the evidence. It is sufficient to say that it was a question of fact for the jury, and that there was evidence tending to show that his industrious and economical habits were such that the deceased would have earned more than a living in the management of his eighty acre farm. Under the evidence we would not be warranted in setting aside the verdict because of the damages allowed.

II. In considering the question of contributory negligence it is necessary to notice the facts with care.

2. RAILROADS: personal injury: contributory negligence: evidence.

The defendant's railroad runs southeast from Centerville, crossing an east and west public highway, about two miles southeast of the city, at what is known as "Brannon's Crossing." Two other highway crossings are passed between Brannon's crossing and the city. Brannon's crossing is at the southeast end of a railroad cut six hundred and sixty feet long. The surface in the northwest angle between the railroad and the highway is high, covered with brush, and prevents a view of the railroad from the highway towards the city for some distance until near the crossing. Most of the evidence relates to experiments made for determining at what point in the highway, west of the crossing, a train could be seen approaching from the city, and at what distance from the crossing. The evidence shows without conflict that the sides of the cut were sloping; that the view of the track became more extended as you approached the crossing from the west, and that when within fifteen to twenty feet of the crossing the track is in full view up to the city. We need not discuss the various experiments in detail. It is sufficient to say that they show that a person seated in a buggy, such as the deceased was in, at a point in the highway

forty-five feet west of the crossing, could see the smoke-stack and a little of the top of the boiler of an engine standing three hundred and thirty feet northwest of the crossing, and that the view expands as you near the crossing. It also appears that the railway could be seen from the highway, west of the high ground spoken of, for some distance north of the cut. The deceased resided a short distance west of the crossing, and was familiar with it and the time of trains. On the forenoon of October 20, 1890, accompanied by his wife and grandson, he started east on the highway in a low phaeton drawn by one horse. Mrs. Brannon was seated with her husband, and the boy was standing on the hind axle or spring. They were seen by a man at a distance to approach the crossing at a trot. The train, consisting of engine, baggage car, and two coaches, left Centerville at 8:44 A. M., twenty-nine minutes late, and approached Brannon's crossing at a speed of about forty miles an hour. The engine struck the buggy between the wheels, injured the horse, and instantly killed all three occupants.

There is no evidence whatever to sustain the charge that the crossing was defective, or that its condition was the cause of the accident. There was a ditch about six feet wide along the west side of the railroad. This was bridged with plank fourteen feet long, laid parallel with the rails, thus narrowing the wagon track, but affording ample width for crossing, but not for turning. The jury must have found that the train was negligently operated, in that no warning signal was given of its approach to the crossing. There is a conflict in the evidence on this subject, but, as the appellant does not question this finding in argument, we are not called upon to consider it, except as it relates to the question whether or not the deceased was negligent.

The highway approached the crossing from the

west by a gradual descent until within about thirty or forty feet, from which point the road was level. There was nothing to prevent stopping and standing a team in the road at any point west of the crossing. The only direct evidence as to the actions of those in the buggy is that of the witness who saw them from a distance and the engineer. The first witness saw them coming down the hill at a trot, but could not see them at the crossing. The engineer states that when within two hundred feet of the crossing he saw the horse's head approaching the crossing at a trot, thirty or thirty-five feet from it. Saw that there were people in the buggy. "I could see them looking right at me." He also states that he did all he could to stop the train, giving in detail what he did.

The foregoing are the material facts, and are unquestioned in the evidence. It is from them that we are to determine whether the deceased was guilty of negligence contributing to his death. The rule as to the care which the deceased was required to exercise is stated in *Nixon v. C., R. I. & P. R'y Co.*, 84 Iowa, 331, as follows: " It is conceded by counsel for the appellant that, ordinarily, there is no excuse for one about to cross a railroad track to recklessly drive upon the crossing without stopping and looking and listening for an approaching train; and this rule has so frequently been announced by this court, as well as the courts elsewhere, that we need not cite the cases. Probably as clear a statement of the rule as has been made is to be found in Pierce on Railroads, page 343. It is as follows: 'A traveler upon a highway, when approaching a railroad crossing, ought to make a vigilant use of his senses of sight and hearing in order to avoid a collision. This precaution is dictated by common prudence. He should listen for signals, and look in the different directions from which a train may come. If, by neglect of his duty, he suffers injury from a passing train,

he can not recover of the company, although it may itself be chargeable with negligence, or have failed to give the signals required by statute, or be running, at the time, at a speed exceeding the usual rate.'" See, also, *Haines v. Ill. Cent. Railway Co.*, 41 Iowa, 227. This rule has been so repeatedly and uniformly announced as not to require further citation.

It was the duty of the deceased to look and listen for trains before going upon the crossing. This crossing was known by him to be unusually dangerous, and therefore it was his duty to exercise greater care. That he did not hear the train in time to avoid the collision is evident from the fact that it occurred, for he surely would not have gone into the danger had he known of it in time to avoid it. The question is whether, by the exercise of care, he could have known of it in time to avoid the collision. The fact that the train was behind its schedule time did not warrant him in presuming that it had passed, or excuse him from listening and looking. Trains are often behind time, and railroad companies have a right to run trains over their tracks at any time. No one survives to tell whether or not the deceased stopped to listen, or listened without stopping. The witness who saw him coming down the hill on a trot says he continued at that gait as long as he could see him. The engineer says the horse was trotting when he first saw him. The distances and speed of the train and horse indicate quite clearly that the deceased did not stop to listen.

The deceased had a right to act upon the presumption that the usual warning signals for the crossing would be given. We have seen that acording to the finding of the jury the signals were not given, and hence it is argued that the deceased could not hear the approaching train, even by stopping and listening. In the absence of signals, the only warning to be heard was the usual noise of the train running into and

through the cut.   Whether by attentive listening, the deceased could hear the noise of the train, depended on the direction of the wind, and the effect of the walls of the cut, and the high ground that obstructed the view. The facts do not warrant the conclusion that in the absence of signals the deceased could have heard the train in time to have avoided the accident, or that he did not listen.   Evidence that signals were given at the two crossings between the place of the accident and the city is uncontradicted; but it does not appear that those signals could be heard by the deceased, or that he was required to act upon them.

We now inquire whether, from the evidence, it appears that, by the exercise of care, the deceased could have seen the train in time to have avoided the collision.   He could not have seen it from. the point where the track was in sight, west of the high ground in the angle, because it is clear from the speed of the train and buggy that the train had not reached. that point of view until after the deceased had passed it.   His next opportunity for seeing the train was forty-five feet west of the crossing.   This is the longest distance given by any of the experiments.   From that point of view the train would be seen three hundred and forty-four feet from the crossing.   Here again, it is evident from the speed of the train and buggy that the train had not reached that point when the deceased passed the point forty-five feet west of the crossing.   While the engineer was not in a position to estimate distance accurately, his evidence is entitled to careful consideration.   Though his statement of distances may not be exact, his statement that he was watching, that he saw the horse going at a trot, then the buggy and people in it looking at him, are statements of facts.   If he was watching as was his duty, he must have seen the buggy and people as soon as they could have seen the train.   As the view of the track enlarges as you near the crossing, it is

evident that the buggy must have been thirty or more feet from the crossing when first seen, and the train more than two hundred feet. Had the deceased been looking at that time, he must surely have seen the train in time to stop. The statement of the engineer that the people were looking at him has reference to a moment later, when he was hurrying from his seat to reverse the engine, and when it was too late to stop the trotting horse. The deceased had opportunity to see the train and avoid the danger, but he did not. But one conclusion can be reached from the facts, and that is that the deceased was negligent in going upon that crossing when and as he did, and that his negligence contributed to cause his death. REVERSED.