A. R. ROGERS, Appellee, v. INTERURBAN RAILWAY COMPANY, Appellant.

Interurban railways: NEGLIGENCE: FAILURE TO SOUND CROSSING SIGNAL: EVIDENCE. In this action for injury to plaintiff's horse and buggy, the result of a runaway near a highway crossing over defendant's track, the evidence is reviewed and held sufficient to support a special finding that defendant was not negligent in sounding the car whistle at the time and place the same was sounded, which was the ground of negligence relied upon, and was therefore insufficient to support a general verdict for plaintiff.

*Appeal from Dallas District Court.*—HON. JAMES D. GAMBLE, Judge.

TUESDAY, FEBRUARY 14, 1911.

ACTION to recover damages for injuries to plaintiff's buggy and horses resulting from a runaway near a highway crossing over the defendant's railroad. There was a verdict for the plaintiff for $200. Defendant appeals. *Reversed.*

*White & Clarke, Guernsey, Parker & Miller* and *A. G. Rippey,* for appellant.

*E. J. Kelley,* for appellee.

EVANS, J.—The accident upon which this action is based occurred on March 15, 1909, at or near a highway

crossing over the defendant's railway a short distance south of the town of Woodward. At this point the railroad runs north and south and the highway east and west. The road-bed at this point is laid upon an embankment, and. the highway is carried over it by a corresponding grade. The plaintiff was driving west in daylight on a cold day with a team of horses and single-seated buggy, the top of which was up and the side curtains on. The plaintiff's cap was drawn down and the collar of his fur coat was drawn up over his ears. At a distance of fifty or seventy-five feet east of the track he saw a car approaching from the south on the railroad track. He stopped his horses and got out of the buggy on the right-hand side, intending at that time to go to their bits. When the motorman saw his approach he sounded an alarm by way of sharp "toots" of the whistle. This excited the plaintiff's horses, as he claims. The car stopped south of the crossing, and the plaintiff drove to the west side. At a point thirty or forty feet west of the crossing he lost control of them, and they escaped, whereby one of the horses was injured and the harness and buggy were damaged. The ground of alleged liability of the defendant is charged by the plaintiff in his petition as follows:

That on or about the 15th day of March, 1909, plaintiff was driving westward with a team and buggy on said highway, and in a careful and prudent manner approached the said crossing of the said railway company. That as he came close thereto a car being operated on the defendant railway company's track, without warning to this plaintiff, approached from the south, and when the plaintiff was about seventy-five feet distant from the track of the said railway company, the said car appeared in sight a short distance from the said team, running at a high and dangerous rate of speed. That, when the said car was distant about fifty feet from the plaintiff and his said team, the motorman thereon, well knowing that plaintiff's team had become frightened and that the plaintiff was endeavoring to control them, did then and there negligently and wrongfully sound the whistle on the said car in a loud

manner, further frightening the said team of this plaintiff, and causing the said team to break away from this plaintiff, and destroy his buggy and harness. . . . That the said defendant was negligent, in that the servants of the said defendant company operating the said car at the time of the occurrence of the matters herein alleged did not give the proper signals or warning to this plaintiff of the approach of their said car, and gave no warning of the approach of said car, and the said servants of the said railway company ran and operated the said car at a dangerously high rate of speed, and that the servants of the said company were negligent in the operation of the said car by reason of the loud sounding of the whistle on the said car when near plaintiff's team, and with knowledge of the dangers and peril in which the said plaintiff and his said team were placed, and that by reason of the negligent acts herein referred to the said team became frightened, and plaintiff suffered the injury herein alleged, resulting in his damage in the sum of $250.

The circumstances leading up to the accident are described by plaintiff in his testimony as follows:

This road on the highway where it crosses the Interurban is graded up. Back east from the track, probably about one hundred feet, they start a narrow grade from there up to the top of the track. It is the same west of the track. On the day of this accident I was driving west, and my team had reached a point about fifty feet from the track when I first saw the car approaching. The car came from the south. I did not hear any whistle blown or bell rung, or other warning of the approach of the car. There was no bell rung or whistle blown on this car as it approached at any time. I first observed the trolley on the car. I reined in my horses, and got out of my buggy. I was about fifty feet from the track. I got out to go forward to get to my horses by the head. At that time the horses were restless. The car having come into sight, the team moved ahead and to one side and back again as a team would that was frightened. I next heard several short blasts of the whistle, and the team bolted ahead. At the time the whistle was blown, I was on the ground and the car

was between fifty and one hundred feet away. When the whistle was blown, I was in plain view of the car and the motorman. When I got out, the team would hardly stop. I got out on the side, and just as I started to go to the horses' heads the whistle blew, and the team plunged forward, dancing back and forth, and, as I started, they started forward faster than I could go. I still had the lines. The team went across the track and broke away from me on the downgrade on the other side. They crossed the track ahead of the car. After the team broke away from me, I looked around when I was probably thirty or forty feet west of the track, and the car was just coming to a stop on the highway, but not quite to the wagon road that crosses the railway tracks. At the time the team took fright there were six short blasts of the whistle. It was a sharp, shrill whistle. The team was unmanageable when they crossed the tracks. They received their scare at the time the whistle was blown. They were probably forty feet east of the track when this whistle was blown. They received their scare at that point. . . . The distance from where this car emerged from the cut before it stopped was about one hundred and fifty feet. From the time I saw the body of the car it was probably two hundred to three hundred feet, and from the time I saw the body of the car emerging from the cut it was about one hundred and fifty feet to where it stopped. I was about fifty feet from the crossing when I discovered the trolley emerging from the cut. I jumped out of the buggy on the right side. This would be the side of the buggy away from the car. I got out between the wheels, and started forward to get the horses by the bits. It was a cold day. The roads were pretty rough. I have been familar with that crossing for a long while, and with the cuts there and with the grades and embankment at that point. . . . As you emerge from the cut going north, it becomes shallower. Standing fifty feet from the track before you could see the car, it would be about one hundred feet from the crossing. When I first stuck my head out of the curtain to look, I was about a couple of hundred feet back from the crossing. I kept my head out looking back and forth north and south until I saw the car. When I saw the car, I jumped out. I do not remember in which

hand I held the reins.  I had my gloves on.  I thought I could control my team better by jumping out and getting hold of the bits.  I did not attempt to control them by remaining seated in the buggy.  The team I was driving was hard to frighten.  I never had any trouble about one of them running away.  Neither of these horses at the time of this accident had shown any indication that they were frightened.  When I saw the trolley of the approaching car, I thought if I drove ahead I would meet the train on the track.  I did not want to take the chances of being ditched there.  I did not see the motorman.  I did not see him give any signal to me. . . . I retained my hold of the lines while the team was going fifty feet from where I got out to the track and still held the lines after they got over the track for a short distance.  I kept my feet also.  The team got away probably thirty feet west of the track.  I noticed where the train was when I got on the track.  It was approaching the cattle guard.  It had not reached the cattle guard when I crossed the track.  It was still in motion, moving very slowly, coming to a stop.

The accident is described by the motorman as a witness for defendant as follows:

As I approached the crossing there was a team and buggy came in sight approaching the railroad track on the east side of the crossing, coming from the east.  As soon as I noticed the horses' heads, I shut the power off from the car to see what was going to be done, what I had to do.  The team came walking along unconcerned, as though they were taking their own way about it.  I began to apply my brakes when I did not see anyone that looked as though they had control of the team.  I then began tooting the whistle to attract their attention.  It was a single-seated top buggy.  The top was up.  It had side curtains on.  From the position I was in when I first saw the buggy I could not see the occupant of the buggy.  I could not see whether any person was in the buggy.  When I discovered this situation, I threw the power off the car, and started to set the brake.  I shut the power off and partially set the brake.  That had the effect of slack-

ening the speed of the car.   When I first saw the buggy I was about four hundred feet from the crossing.   At that time the buggy was about seventy-five feet from the railway crossing.   The horses were on a walk.   When I discovered this buggy in that position, the train was running between twenty and twenty-five miles an hour. When I could not see anyone in the buggy, and the team was walking as though no one was pushing it across or holding it back, I began to toot the whistle at them to attract their attention.   I gave eight or ten blasts of the whistle.   That had the effect of finally attracting the attention of the occupant of the buggy, and I discovered a man's head sticking out of the buggy top, looking down the direction I was coming from.   When I had given these whistles and had discovered the head sticking out in front of the curtain, I was about one hundred and fifty feet from the crossing; that is, the horses' heads.   I next saw the man in the buggy pull his horses up, and jump out on the north side of the buggy.   When I blew these blasts of the whistle, the team was walking.   At that time there was no appearance of fright or excitement or nervousness on the part of the team.   After I had blown these whistles, the man in the buggy got out with the lines in his hands.   At the time when he got out of the buggy, I had slowed down to ten miles an hour, and at that time was about one hundred feet from the crossing.   I did not blow any other whistles after that.   There was no other whistling of any kind after the occupant of the buggy got out.   I then stopped the car.   I stopped it forty-five or fifty feet from the highway crossing.   I saw the man get out of the buggy, and saw who it was.   I gave the man a signal to go over the crossing by waving my hand at him.   I was acquainted with the doctor at that time. I saw who it was after he got out of the buggy.   I waved my hand at him toward the west.   I was facing north. At that time his horses' heads were fifteen or twenty feet from the east rail of the railway crossing.   The doctor then started his team across the railroad track, and as they were crossing the track they started to get excited. There was no appearance of excitement of the team before they reached the railroad track.   They appeared to get excited as soon as they started to cross the tracks.   They

started west down the grade, the doctor on foot holding the lines. The horses started to run, and he could not keep up with them. They had gotten about forty feet from the track when they escaped from his control. The doctor had a fur coat and a big cap on that day, which covered up his face and neck. His fur collar was turned up. He had the lines in his left hand as he went across the track. It was a pretty cold day. The surface of the road there was very rough. It had been cut up and frozen.

In answer to a special interrogatory, the jury found that the defendant was guilty of no negligence in sounding the whistle as the car approached the crossing. It nevertheless returned a general verdict for the plaintiff, and found it to be guilty of negligence in other respects. The only other negligence which is urged upon our attention as supporting the verdict is that the motorman failed to sound the whistle sixty rods distant from the crossing, and that the car approached the crossing at a high and dangerous rate of speed. This contention involves the question whether section 2072 of the Code requiring steam railroads to give certain statutory signals while approaching a crossing is applicable to electric interurban roads. But we pass this question for the present, and direct our first attention to the question whether the evidence in this record warranted a finding that either ground of alleged negligence last stated was the proximate cause of the accident complained of. The plaintiff's petition was manifestly predicated upon the theory that the defendant's motorman frightened his horses by the sharp whistling as he approached the crossing, and that he was negligent in doing so. That the failure to give statutory signals a thousand feet away was not a proximate cause of the accident is evident when it is considered that plaintiff stopped his team and got out of his buggy after he saw the approaching car. According to his testimony, he drove some distance toward the crossing after he saw the car and before he stopped. His team was under control up to this point.

His only claim is that they were later frightened by the sharp whistling. There is nothing in the evidence to warrant a finding that a dangerous rate of speed had anything to do with the accident. The car stopped and waited for plaintiff to pass over the crossing first. It seems to us, therefore, that the special finding of the jury already referred to was quite conclusive of the whole case, and left nothing upon which the general verdict can stand. Whether in the absence of such special finding the general verdict might have stood we need not inquire, nor need we deal with the question of contributory negligence of the plaintiff. It is enough to say that the special finding of the jury exonerating the company from negligence by reason of the warning whistle is amply sustained by the evidence; and whether the evidence would warrant the jury in finding the plaintiff free from contributory negligence is at least a seriously debatable question. The judgment below is *reversed*.