FRANK LANDIS, Appellee, v. INTER-URBAN RAILWAY COMPANY, Appellant.

Railroads: CROSSING ACCIDENT: NEGLIGENCE: SUBMISSION OF ISSUES.
1   Where the evidence, though conflicting, was such as to warrant a finding that an interurban car was running at from forty to forty-five miles an hour when approaching a highway crossing, and it

was in dispute as to whether the whistle was sounded, the question of negligence in both respects was for the jury.

Same: CHANGE OF THEORY ON APPEAL: REVIEWABLE QUESTIONS. Where the defendant in an action for injuries caused by the collision of an interurban car with plaintiff's team at a highway crossing, denied liability because of failure to give the crossing signals but pleaded no other defense, and the cause was tried and submitted on the theory that the crossing was on a highway outside the city limits, the defendant was not in position to raise the question on appeal that the crossing was within the city limits, and that therefore no duty of giving the statutory crossing signals existed. Under such circumstances allegation and proof of failure to give the signals, in the absence of any excuse, is sufficient to authorize recovery.

Same: NEGLIGENCE: EXCUSE: PLEADING. The general denial of a charge of negligence does not permit of proof of excuse; defendant must either confess and avoid the charge or specially plead the facts relied upon in excuse.

Same: CROSSING SIGNALS: STATUTORY REQUIREMENTS. The statutory signals are required to be given by an interurban car when approaching a crossing.

Same: CONTRIBUTORY NEGLIGENCE: EVIDENCE. One driving upon a substantially unobstructed railway crossing, and in front of an approaching car, who fails to look and listen, or if he looks and listens does not see a car which he should have seen in the exercise of reasonable care, is guilty of contributory negligence as a matter of law. Evidence held to show plaintiff was negligent in failing to observe the approaching car in question.

Same: CROSSING ACCIDENT: LAST CLEAR CHANCE. The motorman of an interurban car has the right to assume that a traveler upon the highway will not drive heedlessly upon a crossing, and where a team slackens its pace, apparently with the view of stopping, the motorman is justified in believing that it will stop and is not required to stop his car, until in the exercise of reasonable care it becomes apparent the team is going forward into a perilous position, and then it becomes his duty to use every means at hand to avoid collision.

Same: NEGLIGENCE: WHEN QUESTION FOR COURT. Ordinarily questions of negligence are for the jury; but in cases where it is clear that defendant was without fault and plaintiff contributed to his own

injury the court will exercise its judgment in placing the responsibility where it belongs.

*Appeal from Dallas District Court.*—HON. LORIN N. HAYS, Judge.

THURSDAY, MAY 14, 1914.

ACTION to recover damages for injuries sustained by plaintiff, and for loss and destruction of his property in a collision with a motor car, on defendant's line of road, at a highway crossing in or near the city of Perry. From a verdict and judgment for plaintiff, defendant appeals.—*Reversed.*

*Parker, Parrish & Miller* and *White & Clarke,* for appellant.

*E. J. Kelly* and *H. G. Giddings,* for appellee.

DEEMER, J.—Defendant is an interurban railway company, operating an electric railway between Des Moines, and Perry, Iowa. Its line approaches the latter city from the east, and at the intersection with a street or highway called Moore's lane, on Third street, south of the city, it begins to curve toward the northwest, and crosses what is known as First avenue in a curved line. First avenue runs directly north and south. The curve of which we have spoken is called a three degree one. Moore's lane is approximately seven hundred feet east of First street or First avenue, and about thirteen hundred feet east, and somewhat south, of First avenue there is a deep cut, which obscures the view of a car approaching from the east until it emerges from the cut.

From near Moore's lane eastward the defendant's track is upon a fill, and the approaches to the crossing at First avenue are also filled, and there is a grade on either side of the tracks to the level of the main road. There were cattle

guards and wing fences at the crossings of the two roads already mentioned. A traveler approaching the crossing at First avenue from the south had, by reason of the curvature of the track, a clear and unobstructed view of a car coming from the north or west for a long distance—in fact, nearly to the city of Perry—and at a glance could see the approach of a car coming from that direction. To the south and east the only obstructions to the view, after a car emerged from the cut before mentioned, were telegraph or trolley poles, which were approximately one hundred feet apart, and, as the trolley poles were on the north and east side of the track, the view of an approaching car, at least from Moore's lane, was practically unobstructed, save for a few poles placed on the south side of the track.

For about three years prior to the 12th day of January, 1912, plaintiff was a farmer living south of the city of Perry, and had used the crossing at First avenue on an average of once a week during the entire time. He was perfectly familiar with it, knew the topography of the country, the lay of the ground, and all the obstructions to the view of an approaching car, and said that he regarded the crossing in question a dangerous one. The 12th day of January, 1912, was cold, being from ten to twelve degrees below zero, and a strong wind was blowing from the northeast. The ground was covered with a heavy fall of snow, and prior to the day in question, on account of some drifts, both the crossings referred to were or had been a little difficult to cross. Plaintiff was taking a load of corn to Perry in a bobsled, and it so happened that his brother and a neighbor, with some of the members of his family, were going to Perry in sleds at the same time.

Plaintiff's brother was in the lead, and as they approached the crossing the brother's sled was a rod or two in advance of the plaintiff's. The neighbor was in the rear, and his team was about two rods behind plaintiff's sled. For some little time before the parties reached the crossing plaintiff had been walking behind his sled and talking with the occupants of the rear

sled. He had on a cap and heavy overcoat, and the ear flaps were drawn over his ears, and, according to some of the witnesses, the collar of the coat, which was either of fur or some heavy material, was turned up so as to give additional protection from the cold. Most of the people in the party were shielding their faces from the northeast storm, either by the use of clothing, or by turning their faces toward the northwest as they approached the crossing.

Plaintiff testified that, as he approached the crossing and was within four rods of the track, he jumped upon the reach of the box upon his sled, which was something like eighteen inches deep, and that he stood there driving his team until the sled was struck by a motor car on defendant's line, coming from the south and east. He testified that, beginning a quarter of a mile south of the crossing, he looked at frequent intervals both east and west for cars approaching from either direction on defendant's track. He also said that just before stepping upon the reach he looked in both directions, and again, after he got upon the reach, he looked toward the east, at that time being within forty feet of the railway track. He then said he looked toward the west, and that in neither direction did he see any car. He also said that no warning of an approaching car was given, and that he did not know of the presence of a car, until, by chance, he happened to see it at or near the wing fence on the east side of First avenue, upon which he was driving, and about halfway between First avenue and Moore's crossing, or within three hundred and eighty or three hundred and ninety feet of the crossing.

Plaintiff said that he last looked toward the east when his horses' heads were within twenty feet of the track, and that he saw no car approaching. He also testified that until he reached the crossing his team had been going at the rate of four miles per hour, and that as they came to this approach, because of the grade therein, they slackened their speed to about two or two and one-half miles per hour. We now quote plaintiff's testimony as to just what he did when he saw the car approach-

ing, his horses at that time being upon the tracks: "When I discovered the car, I struck my horses with the lines, and made arrangements to jump, but it struck me just that quick, and that is all I can tell you. The car struck my sled near the center of the box, as near as I can remember. At that time I was on the back of the sled on the center of the reach."

The negligence charged against defendant is: First, the running of its car at a high and dangerous rate of speed at the crossing in question; second, failure to sound the gong or blow the whistle; and, third, failure to use proper care in endeavoring to save plaintiff from harm after his peril was or should have been discovered. Each and all of these specifications were submitted to the jury, and of this complaint is made. We think there was enough testimony to carry the case to the jury upon the first two propositions stated. While the witnesses differ in their estimates as to the speed of the car, there is testimony from which a jury may have found that it was running at from forty to forty-five miles per hour. Whether or not this was negligence, under the circumstances, was a fair question for a jury. *Gray v. Railroad,* 143 Iowa, 268; *Hartman v. Railroad,* 132 Iowa, 582; *Dieckmann v. Railroad,* 145 Iowa, 250; *Kinyon v. Railroad,* 118 Iowa, 349.

1. RAILROADS: crossing accident: negligence: submission of issues.

Again, it was for the jury to say, upon the conflicting testimony, whether or not a whistle was sounded. *Mackerall v. Railroad,* 111 Iowa, 547.

Although defendant filed a general denial, and pleaded no other defenses, yet it was admitted upon the trial that the gong was not sounded, because while in good condition when the car left Des Moines, it, without any fault on defendant's part, became clogged with snow and ice, and could not be operated at the time of the accident, which fact was not discovered until the approach to the crossing where the accident occurred. It is also insisted that there was no absolute duty on the part of the defendant to either sound a whistle or ring a gong, because:

2. SAME: change of theory on appeal: reviewable questions.

(1) The statute does not require it; and (2) because the accident occurred within the city limits of Perry, and there is no statute or ordinance requiring such signals within the limits of a town or city. The trial court instructed that, under section 2072 of the Code, it was defendant's duty to sound a whistle and ring a bell or gong when approaching such a crossing as the one where plaintiff was injured.

At no time during the trial did defendant raise the question as to the accident being within the city limits, and the case was tried as if the accident were on a public highway. It cannot make the point for the first time on this appeal.

As to the failure to ring the gong, the only issue made by the pleadings was whether defendant did ring it or not. Plaintiff affirmed that the gong was not rung, and defendant denied. No issue was tendered excusing the failure to ring the gong, and plaintiff was not compelled to make any other showing upon this proposition than that the bell or gong was not rung.

Under a general denial defendant was not entitled to introduce any testimony in excuse of its failure to ring. The statutes clearly cover this point. See Code, sections 3615 and 3629. If one would avail himself of such a

3. SAME: negligence: excuse: pleading.

defense, he must either confess and avoid or specially plead the facts relied upon in excuse. *Morning v. Long,* 109 Iowa, 289, and *Dow v. Des Moines City R.,* 148 Iowa, 429, announce the principles which must govern here.

Upon the other proposition, as to the duty to sound a whistle and ring the bell of an interurban car when approaching a highway crossing, we have held that the statutes of this

4. SAME: crossing signals: statutory requirements.

state make such a requirement. See section 2033-b of the Code Supplement, as construed in *Swisher v. Railroad,* 151 Iowa, 384, 387; *Rogers v. Railroad,* 150 Iowa, 270. These authorities are challenged, and we are asked to overrule them. No sufficient reason is given why the doctrine there announced should not be

adhered to, and we are content with the pronouncements there made.

II. The defendant strenuously insists that plaintiff cannot recover, for the reason that he did not show that he was free from negligence on his part, and this, with a matter to be hereafter noticed, are the difficult questions in the case.

5. SAME: contributory negligence: evidence.

Within a week after the accident occurred, and while the ground was in substantially the same condition as to depth of snow, etc., as at the time of the collision, numerous photographs were taken of the situation from every angle; plats, elevations, and measurements were taken, and all of these were introduced in evidence and used upon the trial in the examination and cross-examination of the various witnesses. One of the peculiar features of the case is that plaintiff's brother, who was driving a team and sled not more than two rods in advance of the plaintiff, crossed the track in safety, and said that he both looked and listened for approaching cars, and saw and heard none until after he had crossed the track; that his attention was not attracted to the car until he heard a warning signal; and that he then turned quickly around and saw it strike plaintiff's sled. Parties who were in the rear sled were witnesses, but all but one of these were so seated that they could not see a car approaching from the east. The only one of the persons who was in a position to see was not asked as to whether he was looking or listening for an approaching car, but he did testify that he saw the car in time to call to the plaintiff before he was struck, but not in time to avoid the accident. None of the witnesses raised any question about the accuracy of the photographs taken after the accident, or of the plats made of the ground, etc. On the contrary, they generally testified that they were accurate, and correctly reproduced the scene as it existed at the time of the collision.

We here reproduce some photographs showing the view of the track and of an approaching car from the east. The first, being Exhibit 3, was taken from a tripod fifty-two inches from

the traveled road, at a point two hundred and fifteen feet from the crossing.

The car here shown was 1,166 feet east of the crossing.

The second, being Exhibit 4, was taken from the same tripod, one hundred and sixty-seven feet south of the crossing, looking east; the car being nine hundred and eighty-six feet east of the crossing.

The third, being Exhibit 5, was taken from the same

height, two hundred and eighty-four feet south of the crossing; the car being 1,166 feet east thereof.

The next, being Exhibit 6, was taken eighty-eight feet south of the track, from the same tripod; the car being eight hundred and thirty-five feet east of the crossing.

The last, being Exhibit 1, was taken in the center of the crossing and near the south rail, and it shows the obstructions at that point. The car was three hundred and ninety-one feet east of the crossing.

These various photos show the lay of the ground, and it should also be observed that the ground was white with snow, thus bringing into relief any dark object which had snow for a background.

Now, it is true that both plaintiff and his brother testified that as they approached this crossing they looked, not once, but many times, for a car approaching from the east, before going upon the crossing, but that they saw none; although plaintiff himself concedes that he saw the car when it was approximately three hundred and eighty feet from him, but that he could not get his team across the track in time to avoid the collision. No claim is made that he could have gotten across at that time had the car been coming at an ordinary rate of speed, or that he was in any way misled because of the speed of the car.

Laying aside the affirmative testimony, of which there

was much to the effect that plaintiff was standing in his sled shielding himself from the storm and looking to the north or northwest, for a considerable distance before he got upon the track, we have to consider whether, from the conceded facts, the physical conditions and surroundings shown by these photographs, and the other testimony in the case, plaintiff made out a case to go to a jury on the question of his freedom from contributory negligence.

Plaintiff was perfectly familiar with the crossing, and said that he knew it was a dangerous one. He was driving an unusually quiet team, and, aside from the storm and the condition of the weather, there was nothing to divert his attention. He had nothing to do but to look out for his own safety, and he said that, although he looked at various places, and that he knew the crossing was dangerous, he at no time saw the car until his horses were upon the track, and that then it was too late to do anything, going as he was at the rate of from two to two and one-half miles per hour, even if the car had not been running at a high rate of speed. Consequently he was at no time misled by the high speed of the car.

The final and ultimate question is this: Suppose we take plaintiff at his word, and say that he both looked and listened, and heard or saw no car; is this enough, in view of the other circumstances shown, to establish freedom from contributory negligence? It is well settled that, if one drives upon a railway crossing, which is a known place of danger, in front of an approaching train, the view of which is substantially unobstructed, without looking and listening, or if he looks and listens, and does not see a car which he should have seen, had he exercised reasonable care to see, or to hear, but says that he neither saw nor heard, he is guilty of contributory negligence as a matter of law. *Artz v. Railroad*, 34 Iowa, 153; *Pence v. Railroad*, 63 Iowa, 746; *Moore v. Railroad*, 89 Iowa, 223; *Crawford v. Railroad*, 109 Iowa, 433; *Hinken v. Railroad*, 97 Iowa, 603; *Swanger v. Railroad*, 132 Iowa, 32; *Williams v. Railroad*, 139 Iowa, 552; *Wilson v. Railroad*, 150 Iowa, 33;

*Powers v. Iowa Cent. Ry. Co.,* 157 Iowa, 347; *Ring v. Railroad,* 75 N. W. 492; *Bloomfield v. Railroad,* 74 Iowa, 607; *Sala v. Railroad,* 85 Iowa, 679.

Remembering that plaintiff testified that he regarded this a dangerous crossing, and that in consequence he looked several times for a train, we now go to the direct testimony of plaintiff, and also of some of his witnesses, as to the nature of the obstructions which would so hide or shut off the view of the car as that plaintiff might not have seen it had he exercised the degree of care required of him. We here quote from plaintiff's own testimony, the following:

Q. At what distance south of the railway track could you get a view northerly and southerly along the defendant's track? A. It would be about—well, he would really have to go in the right of way to get a good view west. The right of way is about eighty feet wide. Q. Now, tell the jury what the fact is as to whether or not a person approaching the track from the south, as you approached it, and to what extent he has a view of the tracks of the defendant, approaching the tracks from the east? A. Well, the view going north from the south is down south of the track quite a ways. It is pretty fair, and as you near the track, and the ground is high east, and the poles and things, a man hasn't got a very good view. When I got to within four rods of the track I had to turn my head to look to the east along the track. I remember distinctly that when I looked to the east four rods south of the track that I looked along the entire track as far as I could see any car. Q. How long were your eyes cast to the east? A. Well not only a short time, because I looked back at my team. Q. Was it just a mere glance? A. Just long enough to see down the track, then back at my team; I had the lines in my hands. Q. You simply took a glance, and then looked at your team? A. Yes, sir. I think I was looking long enough so that I could see the car. I do not believe you could see a car at 1,300 feet; I never tried it to know whether I could or not. Q. Well, then, whatever that distance was while your horses' heads were going twenty feet, you claim that that car came in sight and struck your sled, do you? A. Struck my sled; yes, sir. Q. Do you claim that? A. Yes, sir; I have never stopped to figure how many miles an hour that car would have to be

going to strike my sled, coming into sight from that view. Q. I understood you to say when you were forty feet that your horses' heads were twenty feet of the track? A. Yes, sir. Q. So that your horses had to travel twenty feet to go on to the crossing while the car was going from a point where it just came in sight up to that crossing? A. Yes. Q. Is that right? A. Yes. Q. Where it comes out of the cut now, if that distance where it comes out of the cut, and it is 1,300 feet from the point where you looked, do you still say to this jury that that car came out of that cut and ran to that crossing while your horses were going twenty miles an hour—twenty feet, I should say? A. I guess they done it. Q. You guess they done it? A. Yes. I know where the cut is, where the car comes out, and you can first see it. I have seen cars coming through that cut and coming in sight. Q. In your travels, many times? A. I believe I have. I am perfectly familiar with the way they come out of that cut and into sight. Q. Then, that being true, there was no obstruction from that point up to the crossing, excepting the telephone posts which were shown in this photograph? A. Excepting what snow there was. Q. You don't mean to say there was snowbanks piled up on that track where this occurred, do you? A. Nothing, only some outside the rails. Q. Was there anything that obstructed your view at all from a point where it came out of that cut up to the crossing? A. Not from right on the crossing; no. Q. Were there any snowbanks that obstructed the view of that car on that grade? A. No, sir. Q. So it is true that, after that car left that cut, it could be plainly seen up to the time it reached this crossing; isn't that true? A. Yes, sir. Q. From any point eighty rods south up to the crossing that car could be plainly seen from the time it left the cut, couldn't it? A. Any point eighty rods south? Q. From any point eighty rods south up to the crossing that car could be plainly seen, after it left the cut, couldn't it? A. Yes; all excepting the telephone poles. Q. Excepting the telephone poles that are shown here in the exhibit? A. Yes, sir; I suppose so. Q. Now, if you look at forty feet south of this track, your horses twenty feet from the track, can you explain to this jury, if you looked carefully, why you didn't see that car? A. I didn't see it. Q. You mean you didn't see, but did you look for, that car? A. Yes, sir. Q. How long did it take for your eyes to cast over that stretch of railway? A.

Long enough to see a car if it had been there.  Q. How long
would that have taken?  A. Just long enough to turn my head
and glance.  Q. That is all you did was to take a glance and
back?  A. Looked to the east and back; glanced to the east
and back to the west, and head straight ahead at my team.
The reach on which I was standing extended about eighteen
inches beyond the wagon box.  My feet were sidewise on the
reach, with my hands on the box.  My body would have been
a little to the northwest.  Q. Your face was to the west be-
cause the wind was coming from the northeast, and you had
your collar up to protect yourself from the wind, and you
were riding that way as you started up that grade?  A. Look-
ing straight ahead; yes.  Q. Well, facing west?  A. No, not
exactly west, kindly of northwestward direction.  Q. North-
westerly?  A. Yes.

Plaintiff's brother testified as follows:

When I looked I could see over about Third street, not
further.  Q. Why?  A. Because there was telephone posts
there and fences at the cattle guards, and a person couldn't
see much further.  The fences, I would judge, are four or
five feet high.  The interurban cars are eleven or twelve feet
high above the rails.  I think the posts are one hundred feet
apart.  Q. From that time where you looked, four rods below,
you tell this jury that those poles would obstruct the view
of the car, so you couldn't see it from the road?  A. Well, a
person could not see it plain.  They might be able to see a little
bit of it if they looked real close.  He might see it in the
summer time.  There was some snow there.  I could not say
how much.  Q. Now do you tell the jury that the snow in
any degree obstructed your view of that car to that cut, up to
the cut?  A. No; I don't know as I can.  Q. If there is the
car, when the car passes out of that cut from that point up
to the crossing, there was nothing in the world to prevent a
man, if he looks carefully, from seeing that car, is there?  A.
No, sir.  Q. And that cut is clear beyond Wood Moore's land,
isn't it?  A. Yes.  Q. The poles wouldn't obstruct that view
would they, if you looked carefully?  A. Well, I believe they
would just a little, when he was right close to the track.  Q.
Right close to the track, but I am asking you four rods south
of the track, within forty feet of the track, that whole space

there, you could see the car coming out of the cut of all that space? A. Some four feet of the track. Q. Some forty feet of the track? A. Forty feet of the track? Q. Yes; that whole space? A. Yes; I expect he could. Q. Yet you claim that you did not see it even when you looked last. A. No; I didn't. . . . I looked carefully. Q. How long were you looking? A. Well, I had a good look down the track. . . . I looked there as far as Third street. Q. Well that is Wood's lane, isn't it? A. Moore's lane. Q. Moore's lane? A. Yes, sir. Q. That isn't half as far as you could see if you had looked is it? A. That's as far as a person could see plainly. Q. What do you mean, plainly—that you couldn't see a car beyond Moore's lane; do you mean that? A. I didn't say I couldn't see it; I said a person couldn't see it plain. He could see it on the grade, but he could not see it while it is back in the cut. Q. That's what I mean, after it leaves the cut, from that time on you can see it plainly? A. Yes, sir. That cut is clear beyond Moore's lane. It is as far beyond Moore's lane as it is from Moore's lane to the crossing. Q. When you looked you only looked down Moore's lane to see the car west of Moore's lane is that right? A. I looked as far as I could see. Q. What was to prevent you from seeing plainly beyond Moore's lane? A. There is a fence and poles there. Q. The fence wouldn't obstruct any part of your view of the car out there; it wouldn't be high enough would it? A. Well, it would, some of it. It would obstruct, I would judge, nearly two-thirds of it. I could see the top of the car all right. When I could see it, I could easily distinguish that it was a car when I saw it above the fence. Exhibit No. 1 is a view of the rails east of the crossing. It seems to have been taken right at the crossing, and I could see down there to Moore's lane easily. Exhibit No. 6 is a true view, and I could see a car anywhere along there. I noticed the car in Exhibit No. 5. By looking carefully you can see it between the poles on the photograph. The photograph exhibit No. 5 presents a view of the poles looking from the highway east.

Another of plaintiff's witnesses testified:

In my judgment, the camera, when Exhibit 3 was taken, was pretty near straight with the main line before the curve started. Q. About where the tangent line east of Third street

would intersect the highway, is that right? A. Toward the M. & St. L. Q. Looking directly down? A. Towards the M. & St. L. Q. Now from your observation can you tell the jury whether or not the view is exact of the track as you approached north from that particular point at which this photograph was taken towards the track, or is the view different in some way? A. I don't remember anything there that would obstruct the view; there may be some very small trees in there, but not very large. Q. How about those poles as you come up nearer the track; what is the fact as to whether or not they obstruct your view back eastward? A. Why there is poles there. The poles are there something as they appear on Exhibit 6. Q. And you see a car there right back of those poles on that photograph, don't you? A. Yes; you can see the car there. Q. So that, when looking for the purpose of seeing whether the car was coming or not from 200 feet up the track, the poles do not interfere then with his seeing the car? A. If he looked very close he can see it.

Another also said:

Exhibit 7 shows substantially the snow condition as it was on the 10th of January. Q. And that, you would say, was a correct view of the snow condition looking north on the 10th day of January at that crossing? A. Yes. Q. And I hand you this photograph marked Exhibit 2, and ask you if that presents a correct view of the crossing, looking south of First street, looking south from First street crossing the Interurban? A. Well it looks south at the First street crossing. Q. Now I wish you would explain again where this bank of snow was, this obstruction with reference to this Moore's crossing? A. East. Q. How far east? A. It was a small crossing there; it is between those two. Q. How many telephone poles is it east of Moore's crossing would you say that snowbank was? A. I have no idea. Q. I show you a map, a plat marked Exhibit 8, which purports to show the M. & St. L. crossing of the Interurban south of Perry, and also the Interurban as it enters Perry and crosses First street; can you point out on this plat, Exhibit 8, about where those snowbank drifts were you have spoken of? (Witness makes a small letter 'a' on the plat where he says the snowdrifts were.) Q. Now, don't you know that it was 1,300 feet from that point where you have

marked that from that crossing up to that crossing? (First street crossing.)   A. I don't know.   I never measured it; never studied it.   Q. Do you know or do you claim that the snowbanks were high as the top of the car?   .  .  .   You are describing down where the snowbanks were on top of that cut? A. Yes, that is what I said all the time.   Q. I will make it plain; I mean in any one traveling up north across this crossing on First street, there were no other obstructions in looking east to see the car than were along there naturally or are there to-day, were there?   A. At the time?   Q. On the 10th of January?   A. Everywhere there were snowbanks around, everywhere.   Q. Do you mean outside of that cut?   A. On top of the cut.   Q. Were there any snowbanks on the 10th day of January that obstructed the view of that car from First street?   A. Not from First street, not excepting the top of the cut, on top of the cut.   Q. The snow piled on it on top of the hill, did it?   A. Just drifted up there, along the fences there.

In view of this testimony, it must be apparent, we think, that plaintiff did not look for the car, or, if he did, that it was a mere glance, and that, if he had exercised the care required of him, he could not have failed to see the approaching car.

In a signed statement made by plaintiff shortly after the accident, he gave the following version, which must have been the true one:

I would not say the crossing is a blind crossing, and the only obstruction is that, as the car comes forward, it's in a curve.  .  .  .   I was standing on the reach which extended out a couple of feet beyond the end of wagon box.   My body was turned toward the west, and I had my head turned toward the direction I was driving, or toward the north.   I had been riding on the reach at this time about ten or twelve rods, and the reason I got on was because I was coming to the track, and I thought I would ride across.  .  .  .   When my brother drove on the track, I was about four rods from the track, and I saw no car then, and he was about the same distance ahead of me when I was struck.   That is the only time I looked toward to the car until the instant before I was struck, and it was so close I knew I could not get off the track.   It might have

been halfway between the two crossings, or it might have been closer.

III. The court instructed the jury on the question of last fair chance. As we view the record, there was not sufficient testimony to justify a verdict upon this ground. It is true the motorman saw the plaintiff approaching the crossing, but he also observed that the horses, for some reason, had slackened their pace.

6. SAME: crossing accident: last clear chance.

This led him to believe that plaintiff was going to stop his team. As soon as he observed that he was going ahead, he attempted to stop the car, and did all that he could with the appliances at hand. The motorman was not obliged to do anything until he saw the plaintiff in a position of peril. He had the right to assume that he would not drive heedlessly upon the track, and, until, in the exercise of ordinary care, he was advised that plaintiff was heedless of his own safety, and was either in or about to get himself into a perilous situation, he was not obliged to act upon the theory that plaintiff would himself be negligent, and place himself in a position of peril.

The testimony shows without conflict that the motorman did everything he could to stop his car after he observed that plaintiff was not going to stop.

While not departing from the rule that questions of negligence and of contributory negligence, are, as a general thing, primarily for a jury, it is nevertheless as much our duty in clear cases to say that a defendant who is without fault should not be held to answer for an injury done, as that a plaintiff or a

7. SAME: negligence: when question for court.

party injured who has not shown himself free from contributory negligence, but, on the contrary, has failed to exercise the care required of him, cannot throw the responsibility upon another, although such other may also have been at fault. So long as the doctrine of contributory negligence applies, it must be recognized by both courts and juries, and, if juries

fail in their duty, the responsibility is upon the court.  Such responsibility is even greater where a jury fails to do its full duty than where it exercises its judgment upon a fair conflict in the testimony, or in the inferences to be derived therefrom.

There is, to our minds, no explanation for the accident, save that plaintiff was entirely heedless or oblivious of his surroundings.

For the reasons pointed out, the judgment must be, and it is—*Reversed.*

LADD, C. J., and GAYNOR and WITHROW, JJ., concurring.