JAMES F. GRIFFIN, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

**RAILROADS:** Accidents at Crossing—Negligence of Automobile Driver. Evidence held not to show contributory negligence *per se*

on the part of the driver of an automobile in attempting to pass over a crossing near a cut with high banks and constructed on a curve.

*Appeal from Wapello District Court.*—SENECA CORNELL, Judge.

SEPTEMBER 30, 1921.

REHEARING DENIED JANUARY 17, 1922.

THIS is an action for damages resulting in personal injuries to plaintiff, growing out of a collision between one of defendant's trains and plaintiff's automobile. Trial to a jury. Verdict and judgment for plaintiff for $2,000. The defendant appeals.—*Affirmed.*

*J. G. Gamble, R. L. Read,* and *McNett & McNett,* for appellant.

*J. J. Smith* and *M. C. Gilmore,* for appellee.

PRESTON, J.—But one error is assigned, and that is that the court erred in overruling defendant's motion for a directed verdict at the close of all the testimony, and erred in submitting the case to the jury, because it appears, as appellant contends, that plaintiff was guilty of contributory negligence, as a matter of law. Plaintiff charged negligence in the following respects: The operation of the train backward around the curve and over the crossing at a dangerous rate of speed, and with the view of the approaching train obstructed by high banks; failure to give signals or warning of approach of train; having no brakeman or lookout on the car approaching the street; not sounding the signal bell at the approach of the train; and running the train backwards at a rate of speed in violation of an ordinance of the city.

The accident occurred about 11:30 A. M., October 19, 1917, at the intersection of Seventh Street and the Rock Island tracks, in the city of Oskaloosa. It was a clear day. Plaintiff was traveling from Spirit Lake to his home at Ottumwa, accompanied by one Carter. Plaintiff was sitting in the front seat at the left, driving, with Carter at his right. They passed through

the city, proceeding east on Sixth Avenue to Seventh Street, and turned south on Seventh, driving south to the point of collision. Seventh Street is largely traveled. The train, or part of a train, was composed of a box car and two cars of coal. It was backing in a westerly direction at the time of the accident. The box car was farthest west, next the two coal cars, and then the engine. There is a brickyard some distance east of Seventh Street, and a switch to it. The track is a single track at the Seventh Street crossing. The track east of the crossing curves to the northeast through a cut. The evidence tends to show that the track is nearer the north side of the cut close to the foot of the embankment. The surface of the street slopes toward the track, both north and south of it, making a dip. Plaintiff had been over this crossing before, and says that, when coming from Ottumwa, from the south, a train to the east could be seen farther as one approaches from the south. He had, on prior occasions, noticed the automatic electric bell, but says that it did not sound on the occasion of the accident. Plaintiff introduced evidence to the effect that the electric bell did not ring at the time of the accident, and that it had not been ringing for two or three days prior thereto. An employee for defendant testifies to the contrary, and that the signal was working properly on the morning of the accident. South from Sixth Avenue to the railroad crossing there are obstructions to the east, an embankment, houses, and outhouses; and there were tomato vines and weeds, which were alive at the time of the accident. There is a conflict in the evidence at different points as to whether the bell was rung and whether the brakeman was on the box car, whether or not he was calling to plaintiff, and so on. The jury, of course, had the right to believe plaintiff's witnesses, notwithstanding the conflict.

Arguing from the testimony of defendant's engineer and observations taken by him, and from his plat made for the purposes of the trial, it is appellant's contention that, at a point 80 feet north of the crossing, the engineer could see an object 6.8 feet above the rails and 200 feet east of the center of the crossing, the only intervening obstruction being the bank; that, at a point 60 feet north of the crossing, the engineer, through his transit level, could see an object 6.1 feet above the rails at a

point 200 feet east of the center of the intersection, and could see an object 4.4 feet above the rails at a point 100 feet east of the intersection; that, from a point 40 feet north of the tracks, he could see 4.9 feet above the rails and 200 feet east of the center of the intersection, and an object 1 foot above the rails at a point 100 feet east; that, at a point 25 feet north of the intersection, his view to the east along the track was unobstructed. From this, it is claimed by appellant that, when plaintiff was 80 feet north of the tracks, the upper half at least of the box car and engine was visible to him, had he looked, but that the flat cars would not be within his view. The box car was 13 feet high from the top of the rails. It is said by counsel for appellant that there is no dispute as to the correctness of these observations, or as to the blue print. Appellee does question the correctness and accuracy of the observations, plat, and the photographs as well. The engineer who made the blue print and testified as to the measurements was assisted by a rodman, who did not testify. The engineer testifies that the surveyor must rely on the rodman, and that he relied on the rodman's doing what he was told. They were both in the employ of the defendant. The engineer testifies that he made the original drawing November 6th, from which he later made the blue print. He does not remember anything of the remains of a garden there; so that, at the time the original drawing was made, the vegetation may have been down. A difference of a foot or two in height of the embankment because of the vegetation would make considerable difference, at the angle of vision of one in the street looking east. We think the claims just referred to, made on behalf of appellant, are not entirely borne out by the testimony for plaintiff. There is a conflict between the testimony of the engineer and that of plaintiff's witnesses as to the height of the embankment.

Going now to plaintiff's testimony: The ordinance was introduced, making it unlawful to run or move locomotive or cars at a greater rate of speed than six miles per hour. Witnesses testifying for plaintiff say that the cut east of Seventh Street was 10 or 12 feet deep, and became deeper farther east; that the north rail of the track was not more than three feet from the bank; that there was one dwelling house on the west

side of Seventh Street, south of Sixth Avenue, where Mrs. Daniels, an eyewitness to this accident, lived; and that on the east side of the street, south of the avenue, there were three houses. The Tilton house is farthest south, 70 or 80 feet from the railroad, and there were sheds and coal houses on the Tilton lot, and tomato vines a foot high, and weeds on top of the embankment. The ground at the Tilton house is about five feet above the street, and the farther south you go, the higher is the embankment on the Tilton lot. Sixth Avenue is about 150 feet to 200 feet from the railroad track. Plaintiff's testimony further indicates that, when one is on the track at Seventh Street, "you can see west pretty good and east quite a ways,—when you are 10 feet north of the track you cannot see along the track east;" that within 10 or 12 feet of the track the surface of the lot east of Seventh Street is 10 or 12 feet higher than the surface of the street. Mrs. Daniels testifies that she witnessed the transaction from her east front porch, and that she had a front view of the railroad crossing; that Tilton's house to the east, next to the track, was in the way of a full view of a train.

"When I first saw the auto, it was right by my house, and I was on the front porch. I noticed them as they approached the crossing. Seems as though they began to slow down, to go across. After I first saw the car, I stepped inside the door, picked up some rugs, and as I went out again, saw the train hit the car. It was about the center of the street. I could plainly see that the train ran into the automobile. The automobile was carried west 25 or 30 feet. It fell on the west sidewalk and seemed to roll over, and then the box car slowed down. I saw the brakeman there immediately after the accident, while they were getting the fellows out. I heard him say, 'Why, I was looking after the school children,' and he said, 'I thought the people that were passing could look out for themselves.'"

Plaintiff testified that, when they turned out of Sixth Avenue into Seventh Street, they were not going very fast,—12 or 15 miles an hour,—and further:

"As we came south on Seventh, we looked as best we could. He [Carter] would look one way and I would look the other, and we would listen for any alarm; and not hearing anything,

we would approach. We heard nothing or saw nothing. I
heard no bell. Would say we were 15 or 20 feet from the rail-
road track when I first noticed the box car, when Carter hol-
lered. About the first I knew of the box car was when Carter
called out, or else my attention had just been attracted that
way when he hollered. I thought we were 12 or 15 feet from
the north rail when my attention was called to the box car. It
was coming at me like a streak of lightning. I had looked
towards the east just a second before that, I thought, and saw
nothing and heard nothing. I tried to turn the car down the
track west, thinking if I could get it on the side I could get
away from it. Could not give the auto much of a turn before
I reached the track, because the box car hit me before I had
time to turn it very far. The box car struck just about where
I was sitting. I did not see any person on the box car that was
approaching. It was onto me so fast that I did not have any
time to observe anything. Would judge the box car was going
considerably faster than I was going; I would say 15 or 20 miles
an hour. I would judge we were 75 or 100 feet north of the
track when I looked east the first time. I looked east to see if I
could see anything or hear anything. I looked east over the
embankment all I could, but saw nothing of the train. I had
not slowed up,—just wanted to have the car under control. In
a car like that, going 12 or 15 miles an hour, you can stop it
pretty nearly instantly. My brakes were good. The top of the
auto did not obstruct my view, where I was sitting. The car
was a six cylinder, and the motor not noisy.''

He also testified that the only time he ever stopped for a
train at that crossing was when he was going from Ottumwa to
Oskaloosa, and then he heard the electric bell, and stopped his
car, and the train passed; that at other times, coming back
from Oskaloosa, he had looked the same as he did this time.

Carter gave similar testimony, and said that plaintiff
seemed to have the automobile under control, as they drove
along the street; that witness looked in both directions, and did
not see any railroad car or engine, or hear any bell ringing. He
thinks they slowed down to about 12 miles an hour, when they
got within 20 or 30 feet of the track. His best judgment is

that the automobile was 20 feet from the track when he first saw the railroad car coming out of the cut.

"Saw no smoke from the locomotive; heard no whistle. The corner of plaintiff's car struck against the corner of the box car. Saw no one on top of the box car. When I first saw the car, I immediately cried out. Plaintiff tried to throw the steering wheel very quickly, but there was not much change in the course in that distance."

The brakeman and another witness gave testimony contradictory, at some points, to the testimony of plaintiff's witnesses.

It is appellant's contention that, taking into consideration the physical facts and the evidence as a whole, with all lawful inferences, and applying the evidence most favorable to plaintiff, it appears without conflict that plaintiff did not exercise ordinary care in approaching the crossing, and that he was guilty of contributory negligence, as a matter of law; that he failed to use his senses of sight and hearing until he had passed the danger zone; that he did not have his car under control, and so on. Counsel rely upon *Yetter v. Cedar Rapids & M. C. R. Co.*, 182 Iowa 1241; *Sturgeon v. Minneapolis & St. L. R. Co.*, 187 Iowa 645; *Landis v. Inter-Urban R. Co.*, 166 Iowa 20; *Powers v. Iowa Cent. R. Co.*, 157 Iowa 347; *Schaefert v. Chicago, M. & St. P. R. Co.*, 62 Iowa 624; *Anderson v. Dickinson*, 187 Iowa 572; *Askey v. Chicago, B. & Q. R. Co.*, 101 Neb. 266 (162 N. W. 647); *Beemer v. Chicago, R. I. & P. R. Co.*, 181 Iowa 642.

By a comparison of the facts in the cases just cited with the facts in the instant case, they can be readily distinguished.

Everyone approaching a crossing should recognize that a railroad crossing is a place of known danger, and that care proportionate to the danger must be exercised, in undertaking to cross. He must do whatever is necessary, as a prudent man, under the circumstances, to protect himself. In other words, he must exercise ordinary care under the circumstances. Generally, it is a question for the jury. In some cases, the undisputed evidence may be so clear that it becomes a matter of law. Such was the situation in the cases cited by appellant. In the *Sturgeon* case, the plaintiff did not have his car under control, and he could have seen the engine in time to stop, had he looked. The undisputed evidence so shows. So it was in

*Sackett v. Chicago G. W. R. Co.*, 187 Iowa 994. In the *Landis* case, the crossing was substantially unobstructed, as the photographs in the opinion show. It is needless to refer to the other cases cited. In the instant case, we have the testimony of two men who were in the car as it approached the crossing, as to the situation as it appeared to them at the time, and that the car was under control. We do not overlook the cases holding that a person may not say that he looked and did not see, when by looking he must have seen; but in the instant case, it was for the jury to say, under the evidence, whether plaintiff did look, and whether he could or did see in time, and whether he had his car under control,—in other words, whether, under all the circumstances, he acted as a prudent man would, under like conditions.

The case of *Williams v. Chicago, M. & St. P. R. Co.*, 139 Iowa 552, refers to a condition where crossing gates were open, as an implied assurance of safety. In the instant case, we may remark, in passing, that a similar circumstance is found, showing that, on prior occasions when plaintiff had crossed this place, there was an electric alarm sounding, which was, as the jury may have found, absent at the time of this accident. In addition, he and the party with him testify that they did look, and could not see in time. The evidence is not so clear that such is not the fact, or that, looking, they could see, or that plaintiff did not have his car under control, as to justify a holding that he was guilty of contributory negligence, as a matter of law. In *Gray v. Chicago, R. I. & P. R. Co.*, 143 Iowa 268, 276, 277, a person was injured at a crossing where the view of the railroad was obstructed by cuts, buildings, and trees; but the extent or completeness of such obstructions was a question of dispute in the testimony. The court, speaking through Mr. Justice Weaver, said:

"The court has no inclination to abrogate the rule that a railway crossing is a known place of danger, and that the sight of the iron rails across his path is a proclamation of warning, to which no prudent man will fail to give heed. * * * But having the right to use it, save only when the danger of collision is so apparent that a reasonably prudent person would not take the risk, or when the circumstances are such that, as

a reasonably prudent person, he should investigate and satisfy himself that the way is clear, and fails to exercise that precaution, it becomes, in the very nature of things, a question of fact whether what he does or fails to do is consistent with exercise of reasonable care on his part. This is always a jury question, save in those exceptional cases where the facts are so clear and undisputed that all reasonable minds must reach a like conclusion thereon.''

The first part of this quotation is now cited as not out of harmony with the instant case. The other part of the quotation is cited by appellee, with numerous other cases, as holding that the question of contributory negligence is one for the jury, except in the exceptional cases referred to. Appellee cites *Barrett v. Chicago, M. & St. P. R. Co.*, 190 Iowa 509, and cases therein cited, as in point, and to sustain their proposition that, under the evidence in the instant case, there was a jury question as to whether or not plaintiff was guilty of contributory negligence.

The opinion is already too long, and we shall not go into a further discussion of the cases. We are of opinion that there was a jury question here, and that the evidence sustains the finding of the jury. The judgment is, therefore,—*Affirmed*.

Evans, C. J., Weaver and De Graff, JJ., concur.